Filed 5/1/25  P. v. Titus CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E082356 |
| v. | (Super.Ct.No. FSB18002017) |
| DOUGLAS KEVIN TITUS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed in part, vacated in part, and remanded.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Douglas Kevin Titus of one count of human trafficking Jane Doe, a 16-year-old girl, by means of force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of injury (Pen. Code, § 236.1, subd. (c)(2)), one count of pimping Doe (Pen. Code, § 266h, subd. (b)(1)), and one count of pandering Doe (Pen. Code, § 266i, subd. (b)(1)).  On appeal, Titus contends that (1) the trial court prejudicially erred by allowing the prosecution to admit certain evidence under Evidence Code sections 1101, 1108, and 352; (2) Evidence Code section 352.2 applies retroactively to nonfinal appeals like his, so the admission of evidence pertaining to a rap video prejudiced him under the new law; and (3) the trial court abused its discretion by denying his motion for a mistrial based on juror misconduct.  (Unlabeled statutory references are to the Evidence Code.)

Titus additionally challenges his sentence on the grounds that the trial court failed to consider his motion to strike a prior strike conviction and that the trial court should have stayed the sentences for two counts under Penal Code section 654.  The People concede the point about the motion to strike.  We agree with both parties on that issue and consequently vacate the sentence, remand for resentencing, and do not address the other claimed sentencing error.  We reject Titus's remaining arguments.

BACKGROUND

At trial, Detective Kimberly Hernandez of the City of San Bernardino Police Department testified for the prosecution as an expert witness on human trafficking and the commercial sex trade.  She had worked as a vice detective focused on investigating crimes involving the commercialized trade of sex, including prostitution, pimping,

2

pandering, and human trafficking and was assigned for two years to a multiagency, countywide human trafficking task force. In addition to testifying as an expert, Hernandez also testified about the investigation that she personally conducted in this case. Hernandez met with Doe three times between July 2016 and May 2017.

The act of pimping prostitutes operates as a subculture with its own vocabulary, hand gestures, and rules, which Hernandez testified about extensively. Hernandez explained that pimps have prostitutes work for them on the street and by posting online advertisements for them. In recruiting prostitutes, pimps commonly look for young women who are particularly vulnerable, such as those who are homeless or come from troubled families. With such victims, the pimp acts as the victim's champion and provider and thereby creates such loyalty that the victim will work for the pimp regardless of how terribly the pimp treats them. Pimps lure victims to work for them as prostitutes by offering them protection when they work, a place to live, and a financially upgraded lifestyle. The promised protection is often illusory because the pimp often does not stay near the prostitutes when they work or follow them to dates.

There are different types of pimps, including a Romeo pimp and a violent pimp. A Romeo pimp creates a romantic relationship typically with young victims and then convinces the victim to work as a prostitute to earn money for the couple collectively as "a team." A violent pimp "uses violence and aggression to keep victims working as a prostitute" and as a means of control. Hernandez opined that most pimps are hybrid pimps; they start out as a Romeo pimp and then become a violent pimp to ensure that the

3

victim continues to work for them. The pimp typically starts acting violently when the victim expresses a desire to leave.

There exists an extreme power differential between a pimp and a prostitute in that a "pimp dictates and controls the relationship completely." Pimps often do not tell prostitutes their legal names and instead use nicknames or monickers. The pimp sets the rules of the relationship, including the prices that a prostitute charges, where and when the prostitute works, what clothing the prostitute wears, how they collect money, and with whom they can interact. A prostitute typically must give her pimp all the money that she earns. Some pimps have quotas, meaning that a prostitute must earn a minimum amount of money per day. One common rule set by pimps is that a prostitute cannot make eye contact or have any contact at all with anyone who possibly could be a pimp, which is generally defined within the subculture as any Black man under the age of 40.

The relationship between a pimp and a prostitute is complex because of the manipulation and coercion that pimps use to convince victims to work for them and to continue engaging in that work. The pimp convinces the prostitute that she needs and wants to work for him and that it is important to earn a lot of money for the "team," even though the pimp takes all the money earned by the prostitute. Victims often have strong emotional attachments to their pimps. Victims often become dependent on their pimps, because the pimp moves them to a different city, isolates them from their friends and family, limits contact with their friends and family, takes away the prostitute's phone,

tells the prostitute not to talk to law enforcement, ensures that the victim does not have any mode of transportation, and does not give the prostitute any money.

Doe testified at trial when she was 22 years old. When she testified, Doe was in custody for failing to comply with the witness subpoena. She did not want to testify, because she feared Titus. Some of Doe's testimony contradicted what she told Hernandez in May 2017.

Doe met Titus around June 2016, when she was 16 years old and lived at a motel with her mother and brother. She met Titus through Seitiny, who had a child with Titus. Doe believed that Seitiny had previously worked for Titus as a prostitute. Seitiny gave Titus Doe's phone number. Titus contacted Doe and told her that he was going to pick her up. Titus introduced himself to Doe as Brodie Loc, but she later learned his real name. Titus picked up Doe and took her to a location on G Street that he said was popular and where Titus told her "we're going to make money." Doe said that Titus did not tell her the specifics about how they would make money, but she knew that she would be "working" as a prostitute, even though she had never worked on the street before.

Titus made numerous promises to Doe, including that she would be safe, she would earn a lot of money, he would buy her a car, and he would improve the lives of her mother and brother by moving them out of the motel. Immediately after Doe started working for Titus, she moved in with him and started having a sexual relationship with him.

5

Doe worked as a prostitute for Titus until September 2016. Doe worked on the street as a prostitute in various cities in southern California, including Pomona and San Bernardino, and Titus also created and posted online advertisements (which included his phone number) for Doe's services. Titus determined when Doe worked, told Doe about what services she could provide on dates, and told her to accept any money offered. Doe explained that a "date" refers to the act of prostitution, which she explained meant "[w]hen you go sleep with the person that's paying for you." Titus gave Doe the drug ecstasy every day that she worked. The prosecutor showed Doe two exhibits containing online advertisements for sexual services that contained photographs of Doe and Titus's phone number, and Doe confirmed that Titus posted them.

Titus required Doe to stay out until she earned a certain amount, which sometimes meant that she stayed out all night until she made her quota. Doe was not allowed to return to Titus without having made any money. Titus expected Doe to give him all the money that she earned from prostitution, which she did. Titus lived off of Doe's earnings, which he kept and spent on himself, buying expensive shoes, clothing, and cars.

When Doe told Titus that she did not want to work or was too tired to work, he made her work anyway. Doe did not believe that she had any choice as to whether she worked. Doe was raped on dates more than 20 times. She told Titus when she was raped, and he responded, "'Oh, I'm sorry,'" and then he sent her "right back out" without a break. Titus did not protect Doe as promised, "[b]ecause he was never around."

6

Doe did anything that Titus told her to do, including working as a prostitute, because she was afraid of him and felt intimidated. She did not leave Titus, because she feared him. Titus acted violently toward Doe "[a]ll the time," sometimes for no reason and sometimes because she broke one of his rules, did not listen to him, talked back, talked to other men, "had an attitude," or did not want to work. Titus hit Doe with his hands and also with objects as weapons, such as a belt, hangers, extension cords, a lamp pole, and a gun. Titus always had a nine-millimeter gun on him, starting the first day that Doe met him. In April 2017, Doe sent Titus a Facebook message claiming that he "'hit [her] with belts extension cords guns and shit . . . .'" Titus responded, "You deserved it bitch." Titus warned Doe that if she left him, then he would shoot her mother and her brother in the face. Doe took Titus's threats seriously.

When Doe started working for Titus, no other prostitutes worked for him. But later Dejahia, who was not a minor, also started working for Titus as a prostitute. Titus also attempted to get one of Doe's high school classmates, Launique—who was one year older than Doe—to work for him. Titus considered Doe his "bottom bitch," which she confirmed meant that she was the "main girl working for him." Hernandez explained that typically, if a pimp has more than one prostitute working for him, there is a hierarchy among the prostitutes, with the "'[b]ottom'" considered the pimp's highest-ranking prostitute. Hernandez stated that a pimp often directs the bottom prostitute to fight with another prostitute, so as to avoid prosecution for the violence himself. Doe confirmed that Titus directed her to fight Dejahia on three occasions because Dejahia was "out-of-

7

pocket" or broke one of Titus's rules. In addition, Titus sometimes beat Doe and Dejahia together. In March 2017, Doe messaged Dejahia on Facebook, "Me and you went through a lot together. Getting our asses beat together."

While Doe worked for Titus, he was involved in the music industry as a rapper but did not make any money from rapping. Titus once directed Doe and Dejahia to be in a music video for a song entitled, "Pimping and Ganging." The prosecutor showed Doe three still images (admitted as People's Exhibit 6) that were taken from the music video. In two of the images, Doe and Dejahia are positioned on either side of Titus, each with one of their arms interlaced through his. The third image depicts Doe and Dejahia seated on a stairway along with several other females who Doe said were also in the video.

In July 2016, in an undercover operation in downtown San Bernardino, Doe was arrested for loitering with the intent to commit prostitution. Doe met with Hernandez at the police station but was not forthcoming with useful information. Doe spoke with Hernandez again about one week later and said that someone other than Titus was her pimp. Hernandez reviewed Doe's cell phone with Doe present and found Brodie Loc by opening Doe's Facebook application. Doe then admitted that Brodie Loc was her pimp. Doe provided Hernandez with Titus's birthdate and age, but she did not yet know his legal name.

Hernandez took a photograph of Brodie Loc's status update on July 29, 2016. The update read, "She's free," apparently in reference to Doe's release from juvenile hall, followed by emojis of the dollar sign, a heel, and the peace symbol, followed by "'Lady

8

GTM.'"  The emojis and symbols are commonly used in the prostitution subculture. The peace symbol and any use of the peace sign means "P, apostrophe, S," which stands for pimp and indicates that the person participates in the prostitution and pimping business. Doe confirmed that Titus referred to her as "Lady GTM," with "GTM" meaning "'get the money.'"

Doe stopped working for Titus when she was again arrested for solicitation and attempted prostitution in September 2016.  In May 2017, Doe called Hernandez, and they met.  Doe described in detail how she had worked as a prostitute for Titus.  Hernandez conducted a further investigation of Titus, including by securing search warrants for various social media sites, which was a standard component of her human trafficking investigations.  Hernandez obtained the records from March 1, 2016, through July 26, 2017, of the Facebook pages of Doe (under her real name), Brodie Loc, Yung Brodie, Dejahia, and "Queen," plus the Instagram page of Brodie Loc GTM.  Doe identified the Queen account as hers.  Hernandez identified the social media pages of Brodie Loc, Yung Brodie, and Brodie Loc GTM as belonging to Titus.

The records from Titus's social media pages included many status updates, photographs, and video recordings that were indicative of pimping and prostitution. Hernandez testified about:  (1) 12 status updates (in addition to the July 29, 2016, post she had earlier photographed on Doe's phone); (2) 15 photographs, including memes; (3) four videos; and (4) 14 direct messages with other social media users.

9

Many of the posts included peace sign emojis or photographs of Titus displaying the peace symbol. In one of those photographs, Titus wore a baseball hat with the letter P on it, which refers to Pomona or pimping, and is a hat that Hernandez has seen many pimps wearing in online photographs. Titus referred to himself as the "Prince of Holt Boulevard" several times. Hernandez explained that the concept of royalty is commonly used in the pimping and prostitution subculture. In September 2016, Titus posted a photograph of a fan of money with overlaid text reading, "'GTMMG Prince of Holt Boulevard,'" to which Doe commented "'Get That Money Money Gang,'" to which Titus replied, "'From the Bottom wit a bottom,'" and Doe replied, "'That's cute.'"

Titus posted several photographs and videos with similar displays of large amounts of cash and of expensive items, such as jewelry and a foreign car (a BMW). It is common for pimps to brag on social media about the things they have acquired, to advertise their success, and to display large amounts of cash to glamorize the lifestyle and to recruit new victims. In one video, the camera pans over a large amount of cash, and in another Titus is seen dropping a large amount of cash into his lap, which is a common type of video Hernandez finds in human trafficking investigations.

Doe commented on a status update from September 2016 in which Titus bragged: "'Flat screen with a PS4 I'm finished shoot shit on Black Ops tonight. Lmao. GTMMG. Bottom made it possible,' peace sign emoji." Hernandez testified that the post demonstrates that Titus was using expensive electronic equipment purchased from the

10

money earned by the prostitute he considered his bottom.  Doe commented, "'From the Bottom wit a bottom,'" to which Titus responded, "'gtmmg.'"

Hernandez found numerous posts and direct messages significant because they were consistent with Doe's account of what happened.  Titus posted numerous photographs of himself with a firearm.  In September 2016, someone sent Titus a direct message notifying him that Doe and Dejahia had just fought, consistent with Doe's account.  In August 2016, Titus told someone that he had "E pills," which Hernandez explained were ecstasy.  In October 2016, Titus told someone that he was with his "'white'" "'ho,'" confirming that he then had a White prostitute working for him.

Titus also posted the following status updates and photographs that were indicative of violence and were consistent with Doe's account of violence:  (1) "'I want to strangle this bitch'"; (2) "'Bitch ask me what I'm supposed to be.  Bitch I'm supposed to be beating your ass on g.p lmao,'" meaning that if a prostitute asked Titus "what he's supposed to be," then Titus should be "beating [their] ass"; and (3) Titus posted a meme saying, "'Bitch I will punch you on accident on purpose.'"  In March 2016, Titus exchanged messages with a user in which Titus told that user "'Your bitch out of line'" and expressed that he was "'going to have to sock that bitch out.'"

In September 2016, Titus posted:  "'[A]ll a bitch do is run her mouth when shit go bad but be the main one on a "—N word—" line that shit funny.  Fucc these bitches I'm going to keep running my program and boss up fucc it why not,' peace sign emoji."  Doe commented on that status update, "'Don't say bitches I didn't do anything,'" and Titus

11

replied, "'LOL you ain't'—'this ain't for you. . . . You solid in my book,'" indicating that he was not referring to Doe as the problem. Hernandez explained that the update confirmed that Titus had more than one prostitute working for him.

Titus also posted numerous status updates and photographs that Hernandez described as consistent with some common rules of prostitution and pimping, some of which were commonly found in human trafficking investigations. In April 2016, Titus posted: "'News flash bitch, if you hoing never expect girlfriend and boyfriend activities and also you don't have an opinion nor choice bitch. Ho up.'" Hernandez explained that the post was significant because Titus was saying "that the prostitute doesn't have an opinion or choice in the matter."

Hernandez found several messages between Titus and other users about pimping in general, including one in which Titus instructed another user on how to use an online escort advertisement service. In August 2016, a user named Kenzel D. asked Titus where he was located, and Titus responded in a series of communications: "'Dino,'" "'for a lil bit,'" "'pgo.'" "[P]go" means "pimping going on." Kenzel indicated that he had a "'little bitch'" who is Black and added that he "'need[ed] some more snow thoee,'" to which Titus remarked, "'Yeah I got snow,'" a common term used to refer to White prostitutes. Hernandez found the message significant because it was sent the second time that law enforcement made contact with Doe in San Bernardino and indicated that Titus was pimping in the same area.

12

Hernandez also discovered various direct messages between Titus and female users, including Doe and Dejahia. On the day that Doe was arrested in July 2016, Titus provided Doe with a phone number and messaged, "[W]ay call me I heard what happened smh I need to talk to you." "'[W]ay'" means "[w]here you at." In November 2016, Dejahia messaged Titus, "'I can't believe you let Asia pepper spray me. You're foul.'" In January 2017, Dejahia messaged Titus, "'No I didn't do a date 1st then go to the atm smh.'" Titus responded, "'Bitch why tf . . . is you inboxing me this shit on fb'" and "'the fucc wrong wit you bitch.'" Pimps often tell prostitutes not to send them messages on social media.

Titus also messaged with a user identified as "Coldest Winterr" in March 2017. He asked her if she was "'ready to choose up,'" and she responded, "'Really Tank.'" Tank is a family nickname for Titus. Titus replied, "'Well you know I'm a pimp.'" Coldest Winterr remarked that he "'never used to get at [her] like that,'" and Titus responded "'I'm pimping. I just never pressed.'" He later says, "'Fucc friendship business in effect,'" "'Man let's get some bread.'" Coldest Winterr responded that she was pregnant, had a child, and was not "'in the streets.'" Titus commented, "'Fucc that BS you got to provide for them and this the key.'" Hernandez explained that the exchange showed Titus trying to get someone to work for him as a prostitute through manipulation.

Two months later, Titus messaged with a user identified as "International Jazz." Hernandez testified that it appeared as though Titus had a cell phone that belonged to

13

International Jazz, and she was trying to retrieve it. Titus said, "'Shut up. I'm at the place rn you betta watch who you talking to. I'll throw this muthafucka. You won't have shit.'" International Jazz said, "'I got regulars to call but you want a play weird ass games.'" Titus said, "'I would miss out on some bread from you bitch just to let you know that you gonna respect me and since I'm missing out cuz you want a talk dumb I'm going to beat your ass period.'"

The prosecution played for the jury two additional videos that Titus posted on Facebook. The jury also was provided with transcripts of those videos. One was posted in November 2016 and is a seven-minute-long recording of Titus looking into the camera and talking while walking on streets that Hernandez testified were near the "blade" in San Bernardino. The "blade" refers to a street frequented by prostitutes. In the recording, Titus remarks, "I might crack me a hoe on live,", "I might knock me a hoe right now," and "Here come my first victim," after which he says, "She's not right at all, little skinny bitch, look at the little bitch." Titus later says, "Caught another victim walking through the alley." Hernandez found significant that (1) the recording was filmed in a location known for a high volume of prostitution, near where law enforcement found Doe working; (2) Titus called two different females walking in the area "victims"; and (3) Titus talked about "knocking a new ho," which indicates that he was trying to recruit a prostitute to work for him.

The other video is a 51-second recording that Titus posted in January 2017. It shows Titus walking underneath an umbrella and talking to a camera. Titus says,

14

"Although I got two hands, I don't have to hold a damn thing because this some real pimpin going on." Hernandez explained that there was "a victim standing behind him holding an umbrella for him." Later, Titus refers to the closure of Backpage and says, "I leaves mines off the curb." Hernandez explained that "the curb" meant that Titus made his prostitutes work "on the street."

The jury found Titus guilty of one count of human trafficking (Pen. Code, § 236.1, subd. (c)(2); count 1), one count of pimping a minor aged 16 years or older (*id.*, § 266(h), subd. (b)(1); count 2), and one count of pandering a minor aged 16 years or older (*id.*, § 266i, subd. (b)(1); count 3). In a bifurcated proceeding, the trial court found true that Titus suffered a prior strike conviction. The court sentenced Titus to an aggregate sentence of 30 years to life in state prison, composed of 30 years to life for count 1 and concurrent sentences of eight years each for counts 2 and 3.

## DISCUSSION

I. *Evidence of uncharged conduct*

Titus contends that the trial court prejudicially abused its discretion by admitting certain evidence under sections 1101, 1108, and 352. We find no prejudicial error.

A. *Relevant proceedings*

Before trial, the prosecution moved to admit certain evidence of uncharged acts of pimping and pandering under both subdivision (b) of section 1101 (§ 1101(b)) and section 1108. The prosecution described the evidence as falling within two broad categories: (1) "[E]vidence related to Defendant's prior pimping and pandering

15

activities," and (2) "evidence whereby the defendant identifies as a pimp and references to the pimping prostitution culture." The People explained that the evidence consisted in large part of Titus's social media activity, in which his "prior pimping, pandering and human trafficking of females is well documented," including posts, photographs, and video recordings in which Titus uses terms frequently used in the pimping and prostitution business and in which he self-identifies as a pimp. The social media activity also included direct messages with females who previously worked for Titus or whom Titus was attempting to recruit. The People argued that the evidence of Titus's prior acts was admissible under section 1101(b) because it was relevant to the issues of motive, intent, knowledge, and common plan. The People also argued that the evidence was admissible under section 1108 because it was highly probative of guilt, given Titus's admissions to pimping and his references to violence toward women engaged in prostitution.

At an initial hearing on the motion, defense counsel asked the People to identify the specific evidence from Titus's social media activity that they were seeking to admit under section 1101(b). The prosecution responded: "There's—so it is from the social media records, and there's either statements by the defendant in which he self-identifies as a pimp and his status updates or videos in which he self-identifies or direct messages with other females. There's also messages with other females that worked for him" or in which he is pandering and attempting to recruit them to work as prostitutes. The court

16

continued the hearing and ordered the prosecutor to provide to defense counsel the specific evidence at issue.

At a later hearing, the court considered the admissibility of evidence under both section 1101(b) and section 1108. The People again proffered that the evidence of prior acts that they intended to admit consisted of Titus's social media activity. Defense counsel did not object to the admission of any communications between Titus and Doe. With respect to communications between Titus and other people, defense counsel acknowledged that he had not read all of the messages but argued that they were not relevant.

The court instructed the prosecutor that "if you seek a conversation with somebody else in the record that the defendant may have had, and, again, this is your case, to show your propensity evidence, then depending on what it is, there may be an objection, and I'll rule on the objection at the time. And so this hearing will just give you the parameters of it, because I agree with you that evidence of—any other evidence or conversations of pimping-type behavior, the pictures of money, you know, things like that, are indicative, and I'm sure your expert's going to testify to that of the crimes charged." But the court noted that "by way of just a general ruling" that any photographs of money or of Titus with Doe or other victims "that might show pimping activity" would be admissible. The court cautioned that defense counsel would be able to object on hearsay grounds later to some of the social media communications, which the court noted were "clearly hearsay." Defense counsel requested a general ruling from the court under

17

section 1101(b), given the large volume of possible evidence from Titus's social media accounts. The court ruled admissible "any prior behavior that [Titus] has that would show—or an expert is going to testify is indicia of pimping activity that goes to intent and knowledge."

As to section 1108, the prosecutor proffered that the evidence concerning the commission of other sexual offenses—specifically, human trafficking—consisted of Doe's testimony that Titus pimped Seitiny when she was a minor and "the defendant's threats or violence towards women that are working for him or individuals that are minors at the time." The prosecutor also proffered that the other section 1108 evidence consisted of (1) Titus pandering in messages with Launique (a minor and a classmate of Doe's); (2) direct messages with International Jazz, an adult who worked for Titus; and (3) evidence of Dejahia working for Titus while Doe worked for him. Defense counsel objected "to any hint of violence toward adults, because that's totally different than human trafficking of a minor by force which carries with it a life sentence." Counsel further argued: "It's not the same crime, and I think it's inadmissible under [section] 352 and arguably not even relevant."

The court admitted the evidence under section 1108. The court acknowledged that the evidence that "four other young women who have been potentially trafficked by the defendant is extraordinarily prejudicial" because "the jury is likely to believe he is more likely to traffic minors if they know about four other women, whether they're minors or not." But the court concluded that the probative value was "quite high," noting that the

18

conduct occurred around the same time as the alleged offenses against Doe and that defense counsel could cross-examine Doe about the four other women.

B.      *Legal framework*

In general, "evidence of prior criminal conduct is inadmissible to show a defendant's predilection to commit other criminal acts." (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1074 (*Wang*); *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823; § 1101, subd. (a)(1).) In cases involving sex offenses, however, section 1108 creates an exception "to the general prohibition against propensity evidence." (*Wang*, at p. 1075.) Section 1108 provides that "'[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352 [permitting [a] court to exclude evidence on weighing probative value and prejudicial impact].'" (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) Section 1108 defines "'[s]exual offense'" as including human trafficking under subdivisions (b) and (c) of Penal Code section 236.1. (§ 1108, subd. (d)(1)(A).)

In addition, "evidence of a prior uncharged act may also be admissible [under section 1101(b)] to prove a disputed material fact—other than a criminal disposition—such as motive, intent, knowledge, or the absence of mistake or accident." (*Wang, supra*, 46 Cal.App.5th at p. 1075; *People v. Leon* (2015) 61 Cal.4th 569, 597 (*Leon*); § 1101(b).) The uncharged conduct must be relevant to proving some fact at issue, which "depends,

19

in part, on whether the act is sufficiently similar to the current charges to support a rational inference of intent, common design, identity, or other material fact." (*Leon*, at p. 598.)

Before admitting evidence of uncharged crimes under either section 1108 or section 1101(b), the trial court "must, by balancing the factors set forth in [section 352], determine whether the probative value of the evidence '"is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."'" (*Wang*, *supra*, 46 Cal.App.5th at p. 1075; *Leon*, *supra*, 61 Cal.4th at p. 598; *Falsetta*, *supra*, 21 Cal.4th at p. 911.) "'[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time.'" (*People v. Williams* (2013) 58 Cal.4th 197, 270-271.) We review for abuse of discretion the trial court's ruling on admissibility under section 1108 and section 1101(b). (*People v. Loy* (2011) 52 Cal.4th 46, 61; *People v. Moore* (2016) 6 Cal.App.5th 73, 92.)

C. *Analysis*

1. *Section 1101(b)*

The only argument in Titus's opening brief concerning section 1101(b) is the following: "In this case, the charged act was not conceded or assumed. Titus did not admit to pimping or pandering Doe. Intent was not an issue. Nor was motive, knowledge Titus was acting as a pimp and knew what the victims were doing, or that

20

Titus engaged in a common plan of benefitting from prostituting women.  None of the grounds presented by the prosecution as a basis for admitting this highly prejudicial evidence were either relevant or probative to the underl[y]ing charges.  The evidence was inadmissible under Evidence Code section 352, 1101, and 1108."  Titus does not make or develop the argument further in his reply brief.

The argument lacks merit.  At a minimum, intent was at issue, because Titus did not admit committing any of the charged crimes, each of which has an intent element.  (CALCRIM Nos. 1150 [pimping], 1151 [pandering], 1244 [human trafficking].)  Pimping, pandering, and human trafficking are not strict liability offenses.  We accordingly conclude that Titus has not shown any error as to section 1101(b).

2.    *Section 1108*

Under section 1108, the trial court admitted uncharged prior sex offense evidence concerning four females:  Dejahia, Seitiny, Launique, and International Jazz.  Titus argues that the trial court prejudicially erred by admitting that evidence under section 1108, because pimping, pandering, and prostitution are not enumerated qualifying sex offenses under section 1108.  (See § 1108, subds. (a), (d)(1).)  He further argues that the trial court committed legal error and thus violated his right to due process by not conducting the required analysis under section 352.

Titus's argument fails because any such error was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)  There was overwhelming evidence of Titus's guilt of all three counts—pimping Doe, pandering Doe, and human

21

trafficking Doe.[1]  Doe described her relationship with Titus in detail, including how Titus promised to enrich her and her family by her prostitution and how Titus frequently acted violently toward her, threatened her and her family if she left, dictated where and when she worked as a prostitute, gave her rules to follow while prostituting including what services she could provide and what to charge customers, posted advertisements on the internet for her services, required Doe to give him all of the money that she earned, and gave her ecstasy every day that she worked.  Titus forced Doe to work when she did not want to work, even after she was raped, and required her to work until she earned a certain quota.  When Doe expressed that she no longer wanted to be a prostitute, Titus reacted by beating her.  In a direct message with Doe, Titus told her that she deserved the beatings.  Doe feared Titus and believed that she had no choice but to work for him.  In a social media post, Titus confirmed that he did not believe that a prostitute had any choice but to work, saying "'[Y]ou don't have an opinion or choice bitch.  Ho up.'"

Hernandez's expert testimony about the pimping and prostitution subculture was

---

[1]  In order to prove the pimping charge, the prosecution had to prove that Titus knowingly derived support or maintenance in whole or in part from the proceeds of Doe's prostitution activities when she was a minor over the age of 16.  (Pen. Code, § 266h, subd. (b)(1).)  For the pandering charge, the prosecution had to prove that Titus took a direct step toward pimping a minor 16 years old or older and that he intended to pimp a minor that age.  (Pen. Code, § 266i, subd. (b)(1).)  For the human trafficking charge, the prosecution had to prove that (1) Titus "caused or induced or persuaded or attempted to cause or induce or persuade another person to engage in a commercial sex act;" (2) when Titus acted, "he intended to commit or maintain a violation of Penal Code section 266h(a)," and (3) when Titus "did so, the other person was under 18 years of age."  (Pen. Code, § 236.1, subd. (c).)  The prosecution also had to prove that Titus committed the human trafficking offense by use of "force, or fear, or deceit, or coercion, or violence, or duress or menace or threat of unlawful injury to the other person or to someone else."  (Pen. Code, § 236.1, subd. (c)(2).)

consistent in every way with Doe's account of how Titus manipulated her and forced her to work for him as a prostitute. In addition to Doe's and Hernandez's testimony, the prosecution admitted online advertisements for sex that contained photographs of Doe and listed Titus's phone number as the contact.

Moreover, setting aside any evidence involving Seitiny, Dejahia, Launique, or International Jazz, Titus's social media activity showed that Titus was a pimp, was Doe's pimp in particular, and was violent with prostitutes. Hernandez explained that Titus's social media activity used phrases, terminology, and symbols commonly used by pimps and that his posts indicated that he was a pimp. Doe's online comments on some of Titus's social media status updates indicated that she was his bottom prostitute. Hernandez explained that in one of the Facebook videos that Titus posted, his words indicated that he intended to recruit prostitutes to work for him and that he referred to two women walking on the street as potential victims.

Given the ample evidence of Titus's guilt, we conclude beyond a reasonable doubt that Titus would not have obtained a more favorable verdict if evidence of uncharged sexual offenses involving Seitiny, Dejahia, Launique, and International Jazz had been excluded.[2]

---

[2] The section of the respondent's brief addressing section 1108 discusses evidence concerning "Coldest Winterr," in addition to evidence relating to Seitiny, Dejahia, Launique, and International Jazz. Titus's opening brief does not challenge the admission of the evidence concerning Coldest Winterr under section 1108, but he does argue the point in his reply brief. The evidence concerning Coldest Winterr does not affect our analysis—any error in the admission of the evidence is still harmless.

23

II.     *Section 352.2*

Effective January 1, 2023—two months after the jury reached its verdict, Assembly Bill No. 2799 (2021-2022 Reg. Sess.) added section 352.2 to the Evidence Code. (Stats. 2022, ch. 973, § 2.) Subdivision (a) of section 352.2 provides: "In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings." "'[C]reative expression'" is statutorily defined as "the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media." (*Id.*, subd. (c).)

In *People v. Venable* (2023) 88 Cal.App.5th 445 (*Venable*), review granted May 17, 2023, S279081, we held that section 352.2 applies retroactively to nonfinal cases like

24

Titus's. (*Venable*, at p. 448.) Other courts have concluded otherwise. (See *People v. Ramos* (2023) 90 Cal.App.5th 578, 596 [§ 352.2 does not apply retroactively], review granted July 12, 2023, S280073; *People v. Slaton* (2023) 95 Cal.App.5th 363, 376 [same], review granted Nov. 15, 2023, S282047.) The Supreme Court has granted review on the issue and will resolve the conflict. (*People v. Venable* (2023) 308 Cal.Rptr.3d 191.) But on a potentially related issue, in *People v. Burgos* (2024) 16 Cal.5th 1, our Supreme Court recently held that Penal Code section 1109—a newly enacted provision mandating bifurcation of gang enhancement allegations if requested by the defendant— does not apply retroactively. (*Burgos*, at p. 8.)

Relying on *Venable*, Titus argues that section 352.2 applies retroactively and that admission of the rap video "Pimping and Ganging" constituted prejudicial error under the new law. As the People correctly point out, however, the rap video and its lyrics were not admitted. Instead, the only evidence admitted concerning the rap video was (1) Doe's testimony that Titus once directed her to be in a video for a rap song entitled, "Pimping and Ganging," and (2) three still images from the video, depicting Doe and Dejahia with Titus in two images and with other females in the third. In his argument concerning section 352.2, Titus also refers to a seven-minute video that shows him walking around San Bernardino and talking. Titus also refers to a video that depicts him dropping a large amount of cash into his lap. (Titus conflates the three videos—the rap video, the video of him walking around, and the video showing him dropping cash into his lap—in his argument, but they are three different videos, only two of which were admitted.)

25

We need not decide whether *Burgos* gives us reason to decline to follow *Venable* regarding section 352.2's retroactivity. Even if *Venable* is right that section 352.2 applies retroactively to nonfinal judgments, Titus has not shown prejudicial error.

With respect to the video of Titus walking around the streets of San Bernardino and talking into the camera (and the associated transcript), Titus mischaracterizes the video as a rap video and assumes on that basis that section 352.2 applies. But it is not a rap video. Moreover, the video does not appear to constitute creative expression under section 352.2, and Titus provides no argument to the contrary. (§ 352.2, subd. (c).) The same analysis applies to the video of Titus dropping cash into his lap.

The three still images taken from the rap video "Pimping and Ganging" are the only evidence that appears to fall within the purview of section 352.2 that Titus argues was erroneously admitted under that provision. Any error in admitting those three images was harmless in light of the overwhelming evidence of Titus's guilt, as described *ante*. Given all of that evidence, it is not reasonably probable that the jury would have reached a more favorable verdict absent the admission of the three still images taken from the rap video. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Rodriguez* (1999) 20 Cal.4th 1, 20 [state law harmlessness standard applies to evidentiary errors].)

III.    *Motion for mistrial*

Titus argues that the trial court prejudicially erred by denying his motion for a mistrial without asking the jurors any questions. We are not persuaded.

26

A.    *Relevant proceedings*

At the start of the trial, the trial court instructed the jury as follows:  "'During the trial, do not speak to a defendant, witness, lawyer, or anyone associated with them.'"

After Hernandez finished testifying, the court told the jury:  "I want to just give you a reminder that when we started the trial, I read an instruction and admonished you to not discuss the case, but also, you couldn't talk to the attorneys or witnesses or anybody else having to do with the case.  Remember I told you they're nice people, but you just are not allowed to talk to them.  So keep that in mind.  That includes the witnesses also who testify, you can't talk to them either or their families or anything like that."

Outside the presence of the jurors and with Hernandez present, the court informed the parties that it gave the jury that additional admonition because the court had been advised that during one of the breaks a juror approached Hernandez and started to talk to her.  The court said that the juror started to ask Hernandez about police work and getting the juror's children into the police academy, and Hernandez confirmed that the inquiry was about the juror's children.  The court asked Hernandez if she told the juror, "something like, I can't talk to you," and Hernandez answered that she had.

Defense counsel orally moved for a mistrial on the grounds of "[s]everal issues," including that a juror spoke with Hernandez in violation of the court's order.  Counsel acknowledged that none of the issues raised was "quite so significant" on its own to warrant a mistrial, but counsel stated that Titus believed that his right to a fair trial had been violated.  Defense counsel also stated:  "I feel like there's a chance a mistrial was

27

granted, then Jane Doe 2 would be here and the hot water would be much deeper if we did the trial over again. So I'm not sure it's a good idea . . . ." The prosecutor responded that the court's admonition after Hernandez's testimony seemed sufficient, given that the juror did not attempt to speak with Hernandez about the case.

The court denied the motion. With respect to the juror's improper communication with Hernandez, the court reasoned: The juror "may have felt that the question, since it wasn't about the case or testimony, that it was an okay thing to approach the witness. The jury has been admonished at this time, and Detective Hernandez stated it was about attending the police academy for their children, so it has nothing to do with this case."

B.      *Analysis*

A criminal defendant has a constitutional right to trial by an impartial and unbiased jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *People v. Brooks* (2017) 3 Cal.5th 1, 98.) "A deprivation of that right occurs even if only one juror is biased." (*People v. Merriman* (2014) 60 Cal.4th 1, 95.)

"'A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged'" (*People v. Clark* (2011) 52 Cal.4th 856, 990), including """if the court is apprised of prejudice that it judges incurable by admonition or instruction""" (*People v. Gonzales* (2011) 51 Cal.4th 894, 921 (*Gonzales*)). """Whether a particular incident is incurably prejudicial is by its nature a speculative matter"""" (*ibid.*) and "requires a nuanced, fact-based analysis" (*People v. Chatman* (2006) 38 Cal.4th 344, 369-370 (*Chatman*)). "The trial court is entrusted with broad discretion in ruling on

mistrial motions." (*Id.* at p. 370.) We accordingly review such rulings for abuse of discretion. (*Gonzales*, at p. 921.)

"A juror's unauthorized contact with a witness is improper." (*People v. Cowan* (2010) 50 Cal.4th 401, 507 (*Cowan*).) Juror misconduct "usually raises a rebuttable 'presumption' of prejudice." (*In re Hamilton* (1999) 20 Cal.4th 273, 295 (*Hamilton*).) "A sitting juror commits misconduct by violating [their] oath, or by failing to follow the instructions and admonitions given by the trial court." (*Id.* at p. 305.) If the alleged juror misconduct "'involves an unauthorized communication with or by a juror, the presumption [of prejudice] does not arise unless there is a showing that the content of the communication was about the matter pending before the jury, i.e., the guilt or innocence of the defendant.'" (*Id.* at pp. 305-306.) Contact between a juror and a witness "may be nonprejudicial if the contact was 'de minimis.'" (*Cowan*, at p. 507.)

The trial court acted within its discretion by denying the mistrial motion. The unauthorized communication that the juror initiated with Hernandez was brief and was not about the case or Hernandez's testimony, so prejudice is not presumed. (*Hamilton*, *supra*, 20 Cal.4th at p. 295.) The trial court questioned Hernandez about the incident, and she confirmed those facts and that she told the juror that they could not communicate. The trial court acted well within its discretion by determining that the brief interaction either was not prejudicial given the content and brevity (*Id.* at pp. 305-306; *Cowan*, *supra*, 50 Cal.4th at p. 507) or did not amount to the type of prejudice that could not be

29

cured by admonition or instruction (*Gonzales*, *supra*, 51 Cal.4th at p. 921), such as the one that the court promptly gave the jury upon learning of the impropriety.

Titus argues that the trial court did not conduct an adequate "nuanced, fact-based analysis" because it did not question the juror about the exchange. (*Chatman*, *supra*, 38 Cal.4th at p. 370.) The argument lacks merit. The court's questioning of Hernandez about the encounter was sufficient to confirm both the content and the brevity of the encounter. The court was not obligated to ask the juror about the communication, particularly given the de minimis nature of the exchange and that it was not presumptively prejudicial. (*Hamilton*, *supra*, 20 Cal.4th at pp. 305-306; *Cowan*, *supra*, 50 Cal.4th at p. 507.)

IV.    *Sentencing issues*

Before sentencing, Titus moved to strike his prior strike conviction under Penal Code section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*). "A trial court's authority under section 1385, subdivision (a), to dismiss 'an action' includes the authority to dismiss allegations of prior serious or violent convictions (i.e., prior strikes) in the furtherance of justice, considering ""both . . . the constitutional rights of the defendant, and the interests of society represented by the People . . . .""" (*People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1093.)

In January 2023, the prosecutor filed an opposition to Titus's *Romero* motion, and the court held a hearing on the same day. The record on appeal does not include a reporter's transcript of that hearing. The minute order states: "Action comes on for

30

Sentencing and Defense Romero Motion. [¶] Defendant states he has hired Attorney Miles Clark. [¶] Attorney needs to be present in order for Conflict Panel to be relieved. [¶] Matter continued by stipulation."

The sentencing hearing was held in August 2023, with Titus's new counsel present. During that hearing, the prosecutor stated that the *Romero* motion filed by Titus's prior counsel had already been denied. Defense counsel did not object. Defense counsel urged the court to sentence Titus to the shortest possible sentence. The court indicated that the problem was that Titus rejected a pretrial offer of a determinate term, at which time the court advised Titus that he faced a life sentence if convicted at trial. The court remarked: "And not only that, this is—the sad thing about it is, is that he has prior acts of violence, and so—and they're recent in time. I knew going forward that—that if he was convicted, you know, fighting—filing a Romero motion, because they're so close in time and it's an ongoing pattern, it would be very difficult for anyone to overcome that, as far as the prior strikes are concerned." The trial court doubled Titus's sentence on the basis of the prior strike. (Pen. Code, §§ 667, subd. (e)(1), 1170.12, subd. (c)(1).)

Titus argues, the People concede, and we agree that remand for resentencing is necessary for the trial court to rule on Titus's motion to strike the prior strike conviction. The record does not contain an express ruling on the motion and does not clearly indicate how the court would have ruled on it if the issue had been brought to the court's attention. We must therefore vacate Titus's sentence and remand for resentencing. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) And because we are vacating Titus's

31

entire sentence, he is entitled to a full resentencing.  (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)  "'[A] full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.'"  (*Ibid.*; *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425.)  The sentence imposed on resentencing may not exceed the original aggregate sentence.  (*People v. Jones* (1994) 24 Cal.App.4th 1780, 1783-1784; *People v. Hanson* (2000) 23 Cal.4th 355, 357-358.)

Our remand for resentencing eliminates the need for us to address Titus's argument concerning Penal Code section 654, which Titus will have the opportunity to raise in the trial court.

DISPOSITION

Titus's sentence is vacated, and the matter is remanded for resentencing.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

32